FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 APR 24  AM 8:31

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF LOUISIANA

Phillip Reed, on behalf of himself
and all others similarly situated,

       Plaintiff

       Versus

The United States of America;
Bean Dredging, L.L.C.; Bean Dredging
Corporation  (f/k/a Eagle Dredging Corporation);
Bean Dredging Corporation (f/k/a Falcon
Dredging Corporation); C. F. Bean L.L.C.;
C. F. Bean Corporation (f/k/a C. F. Bean, Inc.);
Bean Horizon Corporation; Bean Horizon L.L.C.;
Bean Stuyvesant, L.L.C.; Stuyvesant Dredging
Company; Stuyvesant Dredging, Inc.;
Stuyvesant Dredging Co., L.L.C; Royal Boskalis
Westminster N.V.; Gulf Coast Trailing Company;
TLJIC, L.L.C.; T. L. James & Company, Inc.;
T. L. James Marine, Inc.; T. L. James Marine,
L.L.C.; Ham Construction Overseas N.V.; Great
Lakes Dredge & Dock Company; Great Lakes
Dredge & Dock Company, L.L.C. of Louisiana;
Great Lakes Dredge & Dock Corporation of
Delaware; Natco Dredging Limited Partnership;
Great Lakes Trailing Company; Weeks Marine,
Inc.; Mike Hooks, Inc.; Luhr Bros. Inc.; Manson
Construction Co. (a/k/a Manson Construction &
Engineering Co.); Manson Gulf, L.L.C.; Pine
Bluff Sand and Gravel Company; King Fisher
Marine Service, Inc.; King Fisher Marine
Service, L.P. and KFMSGP, L.L.C.

       Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CASE NO.

# 06-2152

# SECT.S MAG4

Fee 350
Process
X Dktd
CtRmDep
Doc. No.

## CLASS ACTION COMPLAINT

Plaintiff, Phillip Reed ("Plaintiff"), individually and as representative of the class defined herein, brings this action against the defendants identified below (collectively "Defendants"), and avers:

## INTRODUCTION.

1.

This is a class action, brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, to recover damages suffered by Plaintiff and the Class members after Hurricane Katrina made land fall on August 29, 2005, when three levee systems failed as a result of environmental damage to protective wetlands caused by the Defendants' maritime activities in the Mississippi River Gulf Outlet ("MRGO") from 1958 through August 29, 2005.  Plaintiff, individually and as a Class representative also seeks an injunction to prevent Defendants from conducting further similar maritime activities that will cause further damage to the man-made and natural flood protection systems that surround Orleans and St. Bernard Parishes.

## PARTIES.

2.

Plaintiff is a citizen of Louisiana, who resides within this district at 7300 Morrison Road, New Orleans, Louisiana 70126.  Plaintiff's home and property were damaged by the waters that flooded the New Orleans metropolitan area when Hurricane Katrina made land fall, forcing him to evacuate with his family.  Plaintiff also suffered other damages described below.

3.

Made defendants herein (collectively "Defendants") are:

a. **The United States of America;**

b. **Bean Dredging, L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

c. **Bean Dredging Corporation (f/k/a Eagle Dredging Corporation),** a Louisiana corporation domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

d. **Bean Dredging Corporation (f/k/a Falcon Dredging Corporation),** a Louisiana corporation domiciled at Hibernia Bank Bldg., Suite 1300, New Orleans, Louisiana, 70112;

e. **C. F. Bean L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

f. **C. F. Bean Corporation (f/k/a C. F. Bean, Inc.),** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

g. **Bean Horizon Corporation,** a Louisiana corporation domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

h. **Bean Horizon L.L.C.,** a Louisiana limited liability company domiciled at 1055 St. Charles Avenue, Suite 500, New Orleans, Louisiana 70130;

i. **Bean Stuyvesant, L.L.C.,** a foreign limited liability company domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office at 1055 St. Charles Avenue, Suite 520, New Orleans, Louisiana 70130;

j.  **Stuyvesant Dredging Company**, a foreign partnership domiciled in New York, with its principal office at 110 West 10th Street, Wilmington, Delaware 19801 and its Louisiana principal place of business at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

k.  **Stuyvesant Dredging, Inc.**, a foreign corporation domiciled at 1209 Orange Street, Wilmington, Delaware 19801 with its office at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

l.  **Stuyvesant Dredging Co., L.L.C.**, a foreign limited liability company domiciled at 110 West 10th Street, Wilmington, Delaware 19801 or at 1209 Orange Street, Wilmington, Delaware 19801, with its Louisiana principal place of business at 3525 North Causeway Blvd., Metairie, Louisiana 70002;

m.  **Royal Boskalis Westminster N.V.**, a Dutch corporation doing business in Louisiana through its wholly-owned subsidiaries Stuyvesant Dredging Company and/or Stuyvesant Dredging, Inc. and/or Stuyvesant Dredging Co., L.L.C.;

n.  **Gulf Coast Trailing Company**, a Louisiana partnership domiciled at 300 Crofton Street, P. O. Box 826, Kenner, Louisiana 70063 and/or at 106 West Mississippi Street, Ruston, Louisiana 71270, and made up of two partners, T. L. James Marine, L.L.C. and Ham Construction Overseas N.V.  On or about March 21, 2001, Gulf Coast Trailing Company was merged into TLJIC, L.L.C.;

o.  **TLJIC, L.L.C.**, a Louisiana limited liability company domiciled at 300 North Vienna Street, Ruston, Louisiana 71270.  One of its members is T. L. James & Company, Inc.;

p.  **T. L. James & Company, Inc.**, a Louisiana corporation domiciled at 300 North Vienna Street, Ruston, Louisiana 71270;

q.  **T. L. James Marine, Inc.,** a Louisiana corporation domiciled at 106 West Mississippi Street, Ruston, Louisiana 71270.  On or about September 24, 1999 T. L. James Marine, Inc. was merged into T. L. James Marine, L.L.C.;

r.  **T. L. James Marine, L.L.C.,** a Louisiana limited liability company domiciled at  106 West Mississippi Street, Ruston, Louisiana 71270.  One of its members is T. L. James & Company, Inc.  On or about December 20, 2000, T. L. James Marine, L.L.C. was merged into TLJIC, L.L.C.;

s.  **Ham Construction Overseas N.V.,** a Dutch Corporation with its principal place of business at 51 de Ruyterkade, Willemstad, Curacao, Netherlands, doing business in Louisiana through Gulf Coast Trailing Company;

t.  **Great Lakes Dredge & Dock Company,** a foreign corporation domiciled at 28 West State Street, Trenton, New Jersey 08608, with its principal place of business at 2122 York Road, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 3925 North I-10 Service Road West, Metairie, Louisiana 70002.  On or about October 31, 2005 it was merged into Great Lakes Dredge & Dock Company, L.L.C. of Louisiana;

u.  **Great Lakes Dredge & Dock Company, L.L.C. of Louisiana,** a foreign limited liability company domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office at 2122 York Road — Tax Department, Oak Brook, Illinois 60523 and its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

v.  **Great Lakes Dredge & Dock Corporation of Delaware,** a foreign corporation domiciled at 1209 Orange Street, Wilmington, Delaware 19801, with its principal office

at 2122 York Road, Suite 200, Oak Brook , Illinois 60523 and its Louisiana principal
place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

w. **Natco Dredging Limited Partnership**, a foreign partnership domiciled in Delaware,
with its principal office at 2122 York Road, Oak Brook, Illinois 60523 and its Louisiana
principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809.
Its general partner is Great Lakes Trailing Company;

x. **Great Lakes Trailing Company**, a foreign corporation domiciled at 1209 Orange Street,
Wilmington, Delaware 19801, with its principal office at 2122 York Road, Oak Brook,
Illinois 60523 and its Louisiana principal place of business at 601 Poydras Street, New
Orleans, Louisiana 70130;

y. **Weeks Marine, Inc.**, a foreign corporation domiciled at 4 Commerce Drive, Cranford,
New Jersey 07016, with its principal office at 106 Derouche Ave., Bourg, Louisiana
70343 and its Louisiana principal place of business at 304 Gaille Drive, Innwoods
Business Park, Covington, Louisiana 70433;

z. **Mike Hooks, Inc.**, a Louisiana corporation domiciled at 409 Mike Hooks Road,
Westlake, Louisiana 70669;

aa. **Luhr Bros. Inc.**, a foreign corporation domiciled at 250 W. Sandbank Road, Columbia,
Illinois 62236, with its principal office at 250 W. Sandbank Road, Columbia, Illinois
62236 and its Louisiana principal place of business at 8850 United Plaza Blvd., Baton
Rouge, Louisiana 70809;

bb. **Manson Construction Co. (a/k/a Manson Construction & Engineering Co.)**, a foreign
corporation domiciled at 5209 East Marginal Way South, Seattle, Washington 98134,

with its principal office at 5209 East Maginal Way South, Seattle, Washington 98134 and its Louisiana principal place of business at 392 Old Bayou Dularge Road, Houma, Louisiana 70363;

cc. **Manson Gulf, L.L.C.**, a Louisiana limited liability company domiciled at 392 Old Bayou Dularge Road, Houma, Louisiana 70363;

dd. **Pine Bluff Sand and Gravel Company**, a foreign corporation domiciled at 1501 Port Road, Pine Bluff, Arkansas 71611, with its principal office at 1501 Post Road, Pine Bluff, Arkansas 71611 and its Louisiana principal place of business at Highway 1 North, P. O. Box 7721, Alexandria, Louisiana 71306;

ee. **King Fisher Marine Service, Inc.**, a foreign corporation domiciled in Texas with its principal office at 12550 Fuqua, Houston, Texas 77034 and its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809;

ff. **King Fisher Marine Service, L.P.**, a foreign limited partnership domiciled in Texas, with its Louisiana principal place of business at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809.  Its general partner is KFMSGP, L.L.C.;

gg. **KFMSGP, L.L.C.**, a foreign limited liability company domiciled in Texas, with its principal office at 12550 Fuqua, Houston, Texas 77034, which is doing business in Louisiana as a general partner of King Fisher Marine Service, L.P.; and

hh. **All insurers and underwriters** who provided primary and excess coverage to the Defendants (except the United States of America) and to the fleet of vessels used by Defendants (except the United States of America) in dredging operations conducted in the MRGO from 1965 through August 29, 2005.  Plaintiff reserves the right to amend and

supplement this complaint for the purpose of naming such insurers and underwriters as soon as their identities are established through discovery.

## JURISDICTION, VENUE AND WAIVER OF SOVEREIGN IMMUNITY.

4.

This Court has jurisdiction over this class action pursuant to (1) 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, Pub. L. 109-2, because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by a citizen of a State that is different from the State where at least one of the Defendants is incorporated or does business; (2) the Suits in Admiralty Act, 46 U.S.C. §§ 741-52, (in personam) because the negligence of the United States of America arises out of its maritime activities, connected to the construction, continuous dredging and maintenance of the MRGO as a navigable channel, and carried out by the United States of America's own fleet of dredging vessels and by fleets of dredging vessels owned by the other Defendants, pursuant to maritime dredging contracts between them; (3) the Public Vessels Act, 46 U.S.C. §§ 781-90, because this matter involves damage caused by one or more public vessels of the United States of America (including the Dredge Wheeler) which have conducted maritime dredging operations for the construction and maintenance of the MRGO during the past sixty years; and (4) 28 U.S.C. § 1331, because some of the claims asserted herein arise under the laws of the United States of America, including the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*

5.

Prosecution of this action in this district is proper under 28 U.S.C. § 1391(a)(2) because all the events or omissions giving rise to the claims asserted herein occurred in this district.

6.

The United States of America waived its sovereign immunity in connection with the claims asserted in this suit by the enactment of the Suits in Admiralty Act, 46 U.S.C. § § 741-52; the Public Vessels Act, 46 U.S.C. § § 781-90 and the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.* Furthermore, the United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act of 1928, 33 U.S.C. § 702c, does not immunize the United States of America for its maritime activities (including dredging activities) conducted in the MRGO. *Graci v. United States*, 456 F.2d 20 (1971).

## FACTUAL ALLEGATIONS

7.

**Project History of MRGO**

The MRGO is a 76-mile man-made navigational channel connecting the Gulf of Mexico to the City of New Orleans. Approved by the United States Congress under the Rivers and Harbor Act of 1956, construction by the U.S. Army Corps of Engineers ("the "Corps of Engineers"), an agency and instrumentality of the United States of America, began in 1958 and was completed in 1965 at an initial cost of approximately $92 million. Authorized to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet, the MRGO bisects the marshes of lower St. Bernard Parish and the shallow waters of Chandeleur Sound. Rationale for MRGO construction was primarily economic, because the 40-mile shorter route through St. Bernard Parish promised a safer and more efficient passage than the Mississippi River below New Orleans. Proponents originally touted the project as a means of great industrial development for St. Bernard Parish.

8.

**Environmental Effects**

The habitats traversed by the MRGO are dominated by shallow estuarine waters and sub-delta marshes. Since the construction of the MRGO, several basic impacts on the region have become evident. These include wetland loss caused by excavation of the channel, soil erosion and shifts in habitat type because of increased salinity. The New Orleans District of the Corps of Engineers believes that the loss of wetlands in the area approaches nearly 3,400 acres of fresh/intermediate marsh. More than 10,300 acres of brackish marsh, 4,200 acres of saline marsh, and 1,500 acres of cypress swamps and levee forests have been destroyed or severely altered. Wetland loss and deterioration caused by MRGO have allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish, where the MRGO is perceived as a "superhighway for storm surge" because of the channel's susceptibility to inundation by tropical storms and hurricanes.

9.

**Prior Knowledge of Potential Harmful Effects**

Before excavation of the MRGO, state and federal resource agencies expressed concern about the project's apparent lack of ecological consideration. Hydrologic models predicted drastic salinity increases and an associated loss of interior marsh habitat. Local concerns mounted as the project's "ecological footprint" expanded and economic benefits failed to emerge. Concerns expanded with a growing perception that the project had dramatically increased the region's vulnerability to hurricanes and tropical storms. By the 1990's, the project was widely characterized as an environmental disaster, although adverse environmental impacts

from the MRGO were evident as early as the late 1960's.  In March, 2000, the Environmental Subcommittee of the MRGO Policy Committee prepared a restoration/mitigation plan to address environmental impacts related to the construction, operation and maintenance of the MRGO.

10.

**Wetlands Provide Flood Protection**

Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater and flood waters.  Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distributes them more slowly over the floodplain.  This combined water storage and braking action lowers flood heights and reduces erosion.  The holding capacity of wetlands helps control floods.  Preserving and restoring wetlands, together with other water retention, often provide the level of flood control otherwise provided by expensive dredge operations and levees.

11.

**Wetlands Destruction by Soil Erosion**

The MRGO channel was excavated through 40 miles of the virgin wetlands of lower St. Bernard Parish and cut through four natural levees to a depth of 36 feet, a surface width of 650 feet, and a bottom width of 500 feet.  The sides of the original channel were at a 25 degree angle. Because the soft soils on the sides of the original channel would not stand up at such a steep angle, the soil began to slide or "slough-off" into the bottom of the channel.  This erosion process has continued over the years, and as a result, the channel is now over 2,000 feet wide at the surface.  This "sloughing-off" of the soft sides along the channel banks only partially explains why the MRGO's banks have eroded from 650 feet wide to over 2,000 feet wide today.

12.

**Wetlands Destruction by Saltwater Intrusion**

The MRGO has no current like the Mississippi River and saltwater from the Gulf of Mexico flows up the MRGO and into the St. Bernard Parish marshes through which the channel was dug. This saltwater intrusion kills the natural vegetation of the marsh and the roots of these dead plants can no longer hold the soil together along the MRGO channel banks. The MRGO has thus created an environmental disaster. Tidal flows, and the wave action, suction, and propeller backwash from passing ships and other marine vessels erode the soil from the MRGO channel banks and it settles into the bottom of the channel.

13.

**Wetlands Destruction by Dredging**

Soil from the MRGO's banks which settles in the bottom of the channel impedes the movement of ships. In order to maintain the depth of the channel to allow ships to pass, the Corps of Engineers, using its own fleet of dredge vessels and through maritime dredging contracts with the other Defendants, continuously dredge soil from the bottom of the channel. The Corps of Engineers and all the Defendants use hopper dredges and other types of dredges, such as the Wheeler Dredge, the Newport Dredge, the Manhattan Island Dredge, the Eagle I Dredge, the Bayport Dredge, the Struyvesant Dredge, the Padre Island Dredge, the Ouachita Dredge, the McFarland Dredge and others, to dredge and then haul most of the dredged soil away and dump it into the Gulf of Mexico. Some of the dredged soil is piled on spoil banks along the channel, but very little is used beneficially to restore the wetlands the channel has

destroyed.   In fact, piling of dredged soil along spoil banks causes further damage to the wetlands behind the spoil banks.

14.

The Corps of Engineers does not mitigate or compensate for the damage it causes to the wetlands.   Each year, the United States of America pays the other Defendants, pursuant to maritime dredging contracts, about $22 million to dredge the bottom of the MRGO channel and dump the soil (originally from St. Bernard Parish's wetlands) into the Gulf of Mexico.   Making matters worse, the Corps of Engineers and its subcontractors (the other Defendants) do advance maintenance dredging to the channel to a depth of 41 feet.   With each dredging, the MRGO channel grows wider and wider.

15.

Until approximately 1992, the Corps of Engineers performed all or most of the dredging of the MRGO.   Since 1993 the Corps of Engineers has dredged the MRGO using the Dredge Wheeler.   The Dredge Wheeler is operated by the New Orleans District of the Corps of Engineers.   It is the largest seagoing hopper dredge in the United States.   The Wheeler is a "trailing suction" hopper dredge and operates much like a giant vacuum cleaner.   It is uniquely designed with three large drag arms and an impressive pumping capacity.   To dredge a channel, the drag arms are lowered over the side of the channel bottom.   While the Wheeler travels forward at a speed of approximately 2 knots, the drag arms suck a water and sand mixture, known as slurry, from the channel bottom.   The slurry passes through the drag heads and pipelines into the hopper.   With all pumps and drag arms operating, the Wheeler fills its hopper with slurry in about 11 minutes; however, pumping continues to allow sediment to displace the

water in the hopper and obtain a maximum load of as much as 7,872 cubic yards of sediment. On a good operating day, the Wheeler can remove 100,000 cubic yards of material, or about 7,000 dumptruck loads, from a project site. The dredged material is transported from the channel being maintained to an authorized Dredge Material Containment Area, where it is deposited by opening 14 hopper doors on the Wheeler's bottom and allowing the material to fall to the ocean floor. In 2005, the Wheeler spent twelve working days dredging the MRGO, from August 11, 2005 to August 27, 2005, and stopping only as Hurricane Katrina was about to make landfall. It removed 503,603 cubic yards of dredge material during that trip alone. The Defendants own and/or operate and/or charter other dredges with characteristics similar to those of the Dredge Wheeler.

16.

From 1999 to 2004, the New Orleans District of the Corps of Engineers awarded 154 contracts to dredge 352,636,430 cubic yards of dredge material. Many of those contracts were awarded to the Defendants.

17.

In addition to the dredging conducted by the Corps of Engineers, from 1993 to 2005 the Defendants dredged the following amounts of dredge material from the MRGO under contracts with the Corps of Engineers:

| YEAR | DEFENDANT | QUANTITY CUBIC YARDS |
|------|-----------|---------------------|
| 1993 | Bean Dredging Corp.<br>Bean Dredging Corp. | 5,700,000<br>11,900,000 |
| 1994 | Gulf Coast Trailing Co.<br>T.L. James & Co., Inc. | 2,000,000<br>6,000,000 |

-14-

| 1995 | Great Lakes Dredge & Dock Co. | 3,600,000 |
| | T.L. James & Co., Inc. | 2,400,000 |
| 1996 | Stuyvesant Dredging Co. L.L.C. | 2,000,000 |
| | Bean Horizon Corporation | 3,300,000 |
| | Bean Horizon Corporation | 1,800,000 |
| 1997 | Gulf Coast Trailing Co. | 2,000,000 |
| | Natco Limited Partnership | 2,000,000 |
| | T.L. James & Co., Inc. | 2,500,000 |
| 1998 | Bean Horizon Corporation | 1,300,000 |
| | Great Lakes Dredge & Dock Co. | 10,500,000 |
| 1999 | Weeks Marine, Inc. | 2,000,000 |
| | Weeks Marine, Inc. | 2,000,000 |
| | Bean Horizon & Stuyvesant (Joint Venture) | 2,000,000 |
| | Bean Horizon Corporation | 1,600,000 |
| | Bean Horizon Corporation | 1,400,000 |
| | Great Lakes Dredge & Dock Co. | 1,500,000 |
| | Great Lakes Dredge & Dock Co. | 1,500,000 |
| 2000 | NONE | NONE |
| 2001 | Great Lakes Dredge & Dock Co. | 3,000,000 |
| | Mike Hooks, Inc. | 4,300,000 |
| | Luhr Bros., Inc. | 1,700,000 |
| 2002 | Bean Stuyvesant, L.L.C. | 400,000 |
| | Bean Stuyvesant, L.L.C. | 2,000,000 |
| | Weeks Marine, Inc. | 2,700,000 |
| 2003 | Manson Construction Co. | 1,500,000 |
| | Manson Construction Co. | 2,000,000 |
| | Weeks Marine, Inc. | 8,800,000 |
| 2004 | Bean Stuyvesant, L.L.C. | 2,000,000 |
| | Great Lakes Dredge & Dock Co. | 2,000,000 |
| | Pine Bluff Sand & Gravel Co. | 1,900,000 |
| | King Fisher Marine Service, Inc. | 1,000,000 |
| 2005 | Great Lakes Dredge & Dock Co. | 4,700,000 |

18.

**The Defendants' Actions in the MRGO Constitute a Threat to Public Safety**

Since 1965, operation and maintenance of the MRGO channel by Defendants have caused the destruction of over 20,000 acres of Louisiana wetlands due to soil erosion, saltwater intrusion and channel dredging. In their natural state, wetlands provide a natural barrier against tidal surge from storms and hurricanes. When hurricanes pass over wetlands, friction is crated, which in turn reduces the storm's wind speeds. Wetlands also absorb hurricane storm surges, softening and shrinking the wall of water that slams inland during a hurricane. Wetlands loss caused by the MRGO now allows a greater volume of water from the Gulf of Mexico to move more quickly inland. Wetlands loss from the MRGO now makes the residents of Orleans and St. Bernard Parishes more vulnerable to tidal surge from tropical storms and hurricanes. The MRGO has increased the flooding risk to thousands of people, their homes and businesses.

19.

**Prior Similar Events**

In 1965, Hurricane Betsy created a tidal surge that moved up the MRGO channel and breached the levees in Orleans Parish, causing $2 billion in damages. Today, the MRGO is a much greater threat to the safety of people living in Orleans and St. Bernard Parishes than it was in 1965 because the MRGO is more than 2000 feet wide, allowing it to carry a tidal surge several times greater than the destructive power of Hurricane Betsy. In 1998, the tidal surge from Hurricane George caused enough erosion to shut down the MRGO for several months, and the channel was re-dredged by the Defendants in order to re-open it to the very small number of

ships that use it for navigation. Today the MRGO provides a superhighway for tidal surge caused by tropical storms and hurricanes.

20.

**MRGO's Role in Hurricane Katrina Disaster**

The Gulf Intracoastal Waterway ("GICW") from its junction with the MRGO and eastward to its outlet into Lake Borgne and Mississippi Sound, is a dredged small craft and barge channel approximately 400 feet in width, with a project depth of 12 feet. West of the MRGO junction, the GICW becomes a ship channel and widens to 800 feet and 32-35 feet in depth to accept MRGO ship traffic. The wider and deeper GICW intersects with the Industrial Canal causing a narrowing funnel shape into the Industrial Canal, which has a depth of approximately 30 feet but a width of approximately 400 feet, and is blocked at its south end by the Industrial Canal locks. The Industrial Canal becomes progressively narrower and shallower as it proceeds toward New Orleans' Ninth Ward like a funnel.

21.

During Hurricane Katrina, levees along MRGO were breached in approximately 20 places along its length, directly flooding most of St. Bernard Parish and New Orleans East. Storm surge from MRGO also caused and contributed to three breaches of the levees along the Industrial Canal. The levee failures were caused by overtopping, as the storm surge rose over tops of the levees and produced erosion that subsequently led to failures and breaches of the levees. The breached levees are located in areas where wetlands had been destroyed. In other areas where wetlands have not been so extensively damaged, the impact of Hurricane Katrina was not as severe and the levees were not damaged.

-17-

22.

Three months before Hurricane Katrina made land fall, Dr. Hassan Mashriqui, a storm surge expert at Louisiana State University's Hurricane Center, called MRGO a "critical and fundamental flaw" in the flood protection system that protects the New Orleans region because it could amplify storm surges 20 to 40 percent.   Following Hurricane Katrina, an engineering investigation and computer modeling has shown that MRGO intensified the initial surge by 20 percent, raised the height of the wall of water about three feet, and increased the velocity of the surge from 3 feet per second to 8 feet per second in the funnel.  This contributed to the scouring that undermined the levees and floodwalls along the MRGO and Industrial Canal.  "Without MRGO, the flooding would have been much less," Dr. Mashriqui said.  "The levees might have overtopped, but they wouldn't have been washed away."  The complete devastation of St. Bernard Parish and areas of Orleans Parish would not have occurred.

## CLASS DEFINITION.

23.

Plaintiff brings this action on behalf of himself and all others similarly situated, who are members of the following Class:

All residents and inhabitants of three of the four protected basins or "Polders" that make up the flood protection system for the New Orleans region:

Polder No. 1 is the Orleans East Bank section polder.  This protected unit contains the downtown district, the French Quarter, and the Garden District.  The northern edge of this polder is fronted by Lake Pontchartrain on the north, and the Mississippi River passes along its southern edge. The Industrial Canal passes along the east flank of this polder, separating the Orleans East Bank polder from New Orleans East (to the northeast) and from the Ninth Ward and St. Bernard Parish (directly to the east). Three large drainage canals traverse this Orleans East Bank polder from

south to north, carrying water pumped by large dewatering pumps north into Lake Pontchartrain.  These canals are the 17th Street Canal, the Orleans Canal, and the London Avenue Canal.

Polder No. 2 surrounds and protects New Orleans East.  This polder fronts Lake Pontchartrain along its north edge, and the Industrial Canal along its west flank.  The southern edge is fronted by MRGO.  The eastern portion of this polder is currently largely undeveloped swampland, contained within the protective levee ring.  The east flank of this polder is fronted by additional swampland, and Lake Borgne is located slightly to the southeast.

Polder No. 3 contains both the Ninth Ward and St. Bernard Parish.  This polder is also fronted by the Industrial Canal on its west flank, and has the MRGO channel along its northern and northeaster edges.  Open swampland occurs to the south and southeast.  Lake Borgne occurs to the east, separated from this polder by the MRGO channel and a thin strip of undeveloped marshland.  The main urban areas occur within the southern and western portions of this polder.  The fairly densely populated Ninth Ward is located at the west end, and St. Bernard Parish along approximately the southern half of this polder.  The northeaster portion of this polder is undeveloped marshy wetland, contained within the protected polder in anticipation of future development.  A secondary levee, operated and maintained by local reclamation districts, separates the undeveloped marshlands of the northeastern portions of this polder from the Ninth Ward and St. Bernard Parish metropolitan areas.

24.

Excluded from the Class are:

a.      the officers and directors of any of the Defendants;

b.      any judge or judicial official assigned to this matter and his or her immediate family; and

c.      any legal representative, successor, or assign of any excluded persons or entities.

## CLASS ACTION ALLEGATIONS.

**a.    Numerosity of the Class.**

25.

The proposed Class is so numerous that joinder is impractical.  The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court.

**b.    Predominance of Common Questions of Fact and Law.**

26.

There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class members and include, but are not limited to, the following:

a.    Whether Defendants caused and/or contributed to the damage of the flood protection system that protects the New Orleans region;

b.    Whether Defendants acted negligent;

c.    Whether Defendants' dredging activities have caused environmental damage to the wetlands that in a natural state would have provided flood protection to Orleans and St. Bernard Parishes;

d.    Whether Defendants knew or should have known that their dredging activities have caused or would cause such environmental damage;

e.    Whether Defendants had a duty to disclose such knowledge to Plaintiff and the Class members; and

     f.      The amount of damages Plaintiff and the Class members should receive in compensation.

     c.      **Typicality.**

27.

Plaintiff and the Class members have suffered similar harm as a result of Defendants' actions.

     d.      **Adequacy of Representation.**

28.

Plaintiff will fairly and adequately represent and protect the interests of the members of the Class because his interests do not conflict with the interests of the Class members he seeks to represent. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex class actions and maritime and environmental litigation.

     e.      **Superiority.**

29.

A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual litigation of the claims of all Class members is impracticable. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to this Court in which individual litigation of thousands of cases would proceed. Individual litigation presents a potential for inconsistent or contradictory judgments, and the prospect of a race for the courthouse and an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation increases the

-21-

expense and delay to all parties and the court system in resolving the legal and factual issues common to all claims related to the Defendants' conduct alleged herein.   By contrast, a class action presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

30.

The various claims asserted in this action are also certifiable under the provisions of Rules 23(b)(1) and/or 23(b)(2) of the Federal Rules of Civil Procedure because:

a.   The prosecution of separate actions by thousands of individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, thus establishing incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual Class members would also create the risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members who are not parties to such adjudications and would substantially impair or impede their ability to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the entire Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole appropriate.

## FIRST CAUSE OF ACTION (NEGLIGENCE).

### 31.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if copied herein.

### 32.

Defendants breached their duty of reasonable care to Plaintiff and the Class members.

### 33.

As a result of Defendants' reckless and/or negligent conduct, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

### 34.

Plaintiff and the Class members are entitled to a judgment finding Defendants liable to Plaintiff and the Class members for damages suffered as a result of Defendants' negligence and awarding Plaintiff and the Class members adequate compensation therefor in amounts determined by the trier of fact.

## SECOND CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTY).

35.

Plaintiff, on behalf of himself and the Class embers, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

36.

Defendants are in the business of dredging the MRGO to maintain it as a navigable channel. When the Defendants undertook the construction and/or dredging of the MRGO they impliedly warranted that their operations would not cause environmental damage to the nearby wetlands and/or flooding of Orleans and St. Bernard Parishes.

37.

Defendants breached their implied warranties because they caused damage to  the wetlands surrounding the MRGO and flooding of Orleans and St. Bernard Parishes.

38.

As a result of Defendants' breach of the implied warranties, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

## THIRD CAUSE OF ACTION
## (CONCEALMENT).

### 39.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

### 40.

At all times during the course of building the MRGO and/or conducting their dredging and/or maintenance activities in and around the MRGO, Defendants failed to disclose to the Plaintiff and the Class members that such maritime activities caused damage to the protective wetlands and increased the risk of flooding to Orleans and St. Bernard Parishes, which was known to the Defendants.

### 41.

Defendants were under a duty to disclose to Plaintiff and the Class members the effects and potential effects of their maritime activities in and around the MRGO.

### 42.

As a result of Defendants' concealment, Plaintiff and the Class members have suffered and will continue to suffer damage of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and past and future medical expenses.

## FOURTH CAUSE OF ACTION
## (VIOLATION OF ENVIRONMENTAL PROTECTION LAWS).

43.

Plaintiff, on behalf of himself and the Class members, repeats, reiterates and realleges each and every allegation set forth above with the same force and effect as if fully copied herein.

44.

Defendants' dredging activities have caused environmental damage in violation of the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*

45.

As a result of the Defendants' violations of the Water Pollution Control Act, 33 U.S.C. § § 1251, *et. seq.*, Plaintiff and the Class members have suffered and will continue to suffer damages of property, cost of restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, death and post and future medical expenses.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff and the Class members demand judgment against Defendants, jointly, severally and *in solido,* as follows:

a.     An order certifying the Class for the purpose of going forward with anyone or all of the causes of action alleged herein; appointing Plaintiff as a Class representative; and appointing undersigned counsel as counsel for the Class;

b.     Equitable, injunctive and declaratory relief, including enjoining Defendants from further dredging the MRGO and declaring that Defendants are liable to Plaintiff and the Class members for all the claims set out above;

c. .    Economic and compensatory damages in amounts to be determined at trial;

d.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.      Attorney's fees and costs of litigation;

f.      Such other and further relief available under all applicable state and federal laws
        and any relief the Court deems just and appropriate;

g.      A trial by jury as to all Defendants.


                        Respectfully Submitted:

                        Camilo K. Salas III (Louisiana Bar No. 11657)
                        SALAS & Co., L.C.
                        650 Poydras Street, Suite 1650
                        New Orleans, LA  70130
                        Telephone:  504-799-3080
                        Fax:  504-799-3085
                        E-Mail:  csalas@salaslaw.com

                        _____
                        CAMILO K. SALAS III


                        Daniel E. Becnel, Jr. (Louisiana Bar No. 2926)
                        William Percy, III (Louisiana Bar No. 01532)
                        Law Offices of Daniel E. Becnel, Jr.
                        P.O. Drawer H
                        106 W. Seventh Street
                        Reserve, LA  70084
                        Telephone:  985-536-1186
                        Fax:  985-536-6445
                        E-Mail:  dbecnel@becnellaw.com

                        _____
                        DANIEL E. BECNEL, JR.

John F. Nevares (Louisiana Bar No. 2009)
John F. Nevares & Associates, PSC
P.O. Box 13667
San Juan, P.R.  00908-3667
Telephone:  787-722-9333
Fax:  787-721-8820
E-Mail:  jfnevares-law@microjuris.com

**Attorneys for Plaintiff Phillip Reed**